[Cite as *State v. Davis*, 2017-Ohio-2916.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

UNTARIO A. DAVIS

    DEFENDANT-APPELLANT.

CASE NO. 13-16-30

O P I N I O N

Appeal from Seneca County Common Pleas Court
Trial Court No. 16-CR-0186

**Judgment Affirmed**

Date of Decision:  May 22, 2017

APPEARANCES:

    *James W. Fruth* for Appellant

    *Derek W. DeVine* for Appellee

**WILLAMOWKSI, J.**

{¶1} Defendant-appellant Untario A. Davis ("Davis") appeals the judgment of the Court of Common Pleas of Seneca County alleging that (1) the trial court entered a conviction against the manifest weight of the evidence; (2) he was denied the effective assistance of counsel; (3) the trial court failed to provide a representative sample of African-Americans in the jury pool; (4) the State engaged in prosecutorial misconduct during closing arguments; and (5) the cumulative effect of the errors of trial counsel was prejudicial. For the reasons set forth below, the judgment of the lower court is affirmed.

*Facts and Procedural History*

{¶2} At the time of the incident forming the basis of this case, Davis lived in Seneca County with his girlfriend, Jessica Slater ("Slater"), and three of her children. Trial Tr. 102. Davis's house was down the street from Jeremy Sauber's ("Sauber") family, and Slater would frequently ask Sauber's fourteen-year-old daughter ("TS") to babysit her children. *Id*. at 85, 104, 125, 146. On the evening of August 27, 2016, Davis walked up to Sauber outside of Sauber's house in between 8:30 and 9:00 p.m. and asked if TS could babysit that evening. *Id*. at 83-85. TS agreed to watch Slater's two young daughters that evening and walked over to Davis's house within four or five minutes of being asked to babysit. *Id*. at 103.

{¶3} Shortly after TS got to Davis's house, Davis told her that he was going to the store and that he would return. *Id*. at 105. At trial, TS testified that Davis left

the house and returned twenty to thirty minutes later with some cash to pay TS for babysitting. *Id.* at 106. Davis then left the house again and, according to TS, returned again ten to twenty minutes later. *Id.* 108-109. When Davis returned to the house, TS was watching television in the living room with Slater's two girls. *Id.* at 110. Davis, who was in another room, told TS to "come here." *Id.* at 110. TS then walked into the room where Davis was. According to TS, Davis asked her if she had ever watched pornography, showed her a picture on his phone of a man groping a woman, and said, "[W]ould you ever do that[?]" *Id.* at 111, 137-138. TS pushed the phone away, told him that she had not viewed pornography before, and went back into the living room where she later fell asleep on the couch with the two girls. *Id.* at 111.

{¶4} TS testified at trial that she was later awoken by Davis tapping her on her upper thigh. *Id.* Davis then asked TS to come with him to the entryway between the living room and the dining room. *Id.* at 113. According to TS, once she had reached the entryway, Davis asked her if "he could lick [her] privates." *Id.* TS testified that she refused and walked back to the couch where the two girls were still sleeping. *Id.* After TS refused, Davis left the house again. *Id.* at 138-139. While Davis was away, TS's mom stopped by the house to check on her. *Id.* at 136. TS asked her mom to buy her some Oreos with the money Davis had paid her for babysitting. *Id.* at 130. TS's mom then went to the store, bought some Oreos, and returned to the house. *Id.* at 137. At this time, TS did not mention to her mother

that Davis had solicited her or shown her an adult image on his phone. When asked at trial why she did not tell her mom about this situation, TS said, "I wasn't thinking about it then. * * * I was trying to get it out of my head." *Id*. at 139. After being away for about an hour, Davis returned to his house where TS was sleeping on the couch with the two girls. *Id*. at 128. At several more points that night, Davis woke TS up and solicited her. *Id*. at 114. TS described one of these interactions, saying

> **And he told me that I was pretty and not to tell Jessica. And then * * * we stood there for a second and then he grabbed my shirt right here. And then * * * he started pulling me closer. And then I pushed off of him * * * and then he said, what? I said, nothing. He said, what, you think I'm going to kiss you or something? And I said, yeah. Because that's what normally happens when people pull people closer like that.**

*Id*. at 115. According to Taylor, Davis woke her up and solicited her a total of six or seven times that night. *Id*. at 115, 132.

{¶5} The next morning—which was August 28, 2016—TS woke up around 8:20 a.m. *Id*. at 116. She had planned to get up earlier because she was going to help her father reseal a parking lot that morning. *Id*. at 119. When she realized she was running late, she rushed home. *Id*. at 116. TS testified that Davis was asleep in his bedroom at the time that she left. *Id*. at 117. When she got home, she and her father departed for the worksite. *Id*. at 119-120. After they arrived, TS worked for about five minutes before she told her father that she needed to talk to him. *Id*. at 120. She then told him that Davis had solicited her the previous evening. *Id*. at 121.

Sauber then called Davis's girlfriend, Slater, who reported Davis to the police. *Id.* at 122, 149.

{¶6} On August 29, 2016, the police filed a criminal complaint against Davis for importuning in violation of R.C. 2907.07(B)(1), which is a fourth degree felony. Doc. 1. The jury trial was held on October 1, 2016. Trial Tr. 1. During defense counsel's opening statements, he said,

> **When [TS] came to babysit, Mr. Davis went to get some money for her to pay her, and then he left because he had a babysitter. He did not return until very early or late, depending on how you want to look at it, the next morning. He wasn't there. He's going to testify for you. He's going to make that extremely clear, okay. State's asked you to pay particular attention to [TS's] testimony. I ask you to give that same courtesy to Mr. Davis' testimony. He's going to tell you exactly where he was. Exactly what he was doing. It was not at that house. And he certainly was not propositioning [TS].**

*Id.* at 79. Consequently, when Sauber, TS, and Slater testified, defense counsel questioned them on the timing of their various interactions with Davis on the night of August 27, 2016. *Id.* at 81, 97, 142. At the time of the defense's case-in-chief, however, Davis did not testify. *Id.* at 170.

{¶7} When Sauber testified, he said that he did not see Davis after Davis left the Sauber's house between 8:30 and 9:00 p.m. on August 27, 2016. *Id.* at 88. Slater testified that she was "gone the entire evening" and was not aware that TS was babysitting for Davis until Sauber called her on August 28, 2016. *Id.* at 147. Slater was briefly in contact with Davis on the phone and saw him once while she was

driving through town, but she was unable to remember the times when these events occurred. *Id.* at 152.

**{¶8}** When TS testified during direct examination, she stated that she did not have a cell phone on which she could check the time, was not looking at a clock while she was babysitting, and was unaware of the exact times when Davis was home. *Id.* at 114. During cross examination, defense counsel questioned TS about the times at which different events occurred that night.

> **Q. How long was he gone between the - -**
>
> **A. * * * [H]e was gone for about an hour.**
>
> **Q. Okay. About an hour, okay. So if you told officers another time, amount of time, would that be an issue?**
>
> **A. Yeah.**
>
> **Q. Okay. If you said that he was gone longer than that, or you're just not really sure how long he was gone?**
>
> **A. I really wasn't sure how long he was gone.**

*Id.* at 128. Later, defense counsel questioned TS about the time she left Davis's house on the morning of August 28, 2016.

> **Q. Okay. And what time on the next day in the morning, what time did you leave the house?**
>
> **A. Eight-twenty.**
>
> **Q. Eight-twenty[.] Okay. So if in your statement you said you left the house at 7:30, which, which would be right?**
>
> **A. I left at 8:20.**

> **Q. Okay. So in your statement officers said 7:30, that's, that's not correct?**
>
> **A. No.**
>
> **Q. Okay.**
>
> **A. That should have been an eight.**

*Id*. at 128-129.

{¶9} Defense counsel also asked whether any of TS's brothers were with her and her father at the job site. TS stated that her brother was not present. This line of questioning continued as follows:

> **Q. Okay. And, and if your dad said [your brother] had gone, would that be correct, incorrect?**
>
> **\* \* \***
>
> **A. Oh, I don't know. He might have went [sic] to go pick him up after, but when I was there, [my brother] was there. My brother was there.**
>
> **Q. So he was already at the site?**
>
> **A. Yeah. He didn't go with us the first time, though. When we first got picked up, he didn't go.**
>
> **Q. First got picked up?**
>
> **A. When we, when I got home, I got dressed.**
>
> **Q. Okay.**
>
> **A. And then the boss came to pick us up. And when he picked us up, my brothers didn't go.**
>
> **Q. Okay. So he, but was he already gone?**

* * *

**A. No. He was asleep when me and my dad left the first time.**

**Q. Okay.**

**A. So when we were at the police station, the boss might have went to go pick him up to have the work done.**

*Id*. at 131-132. During closing arguments, defense counsel referenced these exchanges as evidence of inconsistencies in TS's testimony that establish reasonable doubt. *Id*. at 187-189. As appellant, Davis again points to these exchanges to argue that his conviction is against the manifest weight of the evidence.

**{¶10}** During the State's closing arguments, the prosecution referenced a statement in defense counsel's opening arguments in which defense counsel told the jurors that the trial would show that Davis was not present with TS when the alleged crime occurred. The prosecutor stated,

> **Now, what has the [d]efense been in this case? Well, during opening statements, we heard from Mr. Smith [defense counsel]— and again, I'm not a good notetaker. She is, but I'm not. But my recollection was that he said the evidence was going to show that his client wasn't even there. What evidence have you heard or seen that he wasn't there? I would suggest that you've heard nothing supporting that defense that he wasn't there.**

*Id*. at 183. At trial, no objection was made to this comment, but Davis now challenges this statement on appeal. *Id*.

**{¶11}** On November 1, 2016, the jury found Davis guilty of importuning and made the additional finding that Davis had been previously convicted of a sexually

oriented offense. Doc. 21, 22. Davis was sentenced on November 1, 2016. Doc. 24. Davis a filed notice of appeal on November 22, 2016. Doc. 30. Davis raises the following five assignments of error on appeal.

### First Assignment of Error

**The appellant was denied due process and a fair trial pursuant to U.S. Constitutional Amendments 5, 6, and 14 and Ohio Constitution Article 1, Section 10 because his conviction for importuning was against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented.**

### Second Assignment of Error

**The appellant was denied his constitutional right to effective assistance of counsel when the appellant's trial counsel failed to protect appellant's rights at trial.**

### Third Assignment of Error

**The trial court failed to ensure a representative sample of African-Americans in the jury pool, in violation of U.S. Constitution, Amendment 6, which guarantees the right to a jury trial by peers.**

### Fourth Assignment of Error

**The appellant was denied due process and a fair trial pursuant to U.S. Constitutional Amendments 5, 6, and 14 and Ohio Constitution Article 1, Section 10 when the prosecutor engaged in misconduct in his closing argument at trial, which conduct substantially prejudiced the appellant.**

### Fifth Assignment of Error

**The cumulative effect of trial counsel's errors amounted to ineffective assistance of counsel, thereby prejudicing appellant Davis and violating his 5th, 6th & 14th Amendment rights to the**

**U.S. Constitution and violating his rights under Article 1, Section 1, 10, & 16 of the Ohio Constitution.**

For clarity of analysis, we will consider the first, third, and fourth assignments of error before we proceed to the second and fifth assignments of error.

*First Assignment of Error*

**{¶12}** Here, Davis contends that his conviction for importuning should be overturned because the verdict was against the manifest weight of the evidence. While Davis uses the words "manifest weight" to label his first assignment of error, he sets forth the standard for sufficiency of the evidence in his brief and frames his entire argument around this standard. Since the "weight of the evidence and [the] sufficiency of the evidence are clearly different legal concepts," we will evaluate the facts of this case under both standards. *State v. Thompkins*, 78 Ohio St.3d 380, 389, 678 N.E.2d 541 (1997). We will first review the record to determine whether the verdict was supported by sufficient evidence; we will then determine whether the conviction is consistent with the manifest weight of the evidence.

Sufficiency of the Evidence Review

**{¶13}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Walters*, 3d Dist. Defiance No. 4-16-17, 2017-Ohio-793, ¶ 6, quoting *State v. Jenks*, 61 Ohio St.3d

259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). This analysis does not attempt to "resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Eckard*, 3d Dist. Marion No. 9-15-45, 2016-Ohio-5174, ¶ 9, citing *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33.

{¶14} Under the sufficiency of the evidence standard, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Eckard* at ¶ 9, quoting *Jenks* at paragraph two of the syllabus. Whether evidence is legally sufficient to support a verdict is a question of law and a "test of adequacy rather than credibility or weight of the evidence." *State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19, citing *Thompkins* at 386. Here, Davis was convicted of importuning in violation of R.C. 2907.07(B)(1). Thus, the State had to prove that Davis

> **[1] solicit[ed] another, not the spouse of the offender, [2] to engage in sexual conduct with the offender, [3] when the offender is eighteen years or older [4] and four or more years older than the other person, [5] and the other person is thirteen years of age or older but less than sixteen years of age, whether or not the offender knows the age of the other person.**

R.C. 2907.07(B)(1).

Legal Analysis

**{¶15}** After reviewing the record, we find that the State presented evidence for each of the essential elements for the offense of importuning. Regarding the first element, TS said at the outset of her testimony that she had never been married. Trial Tr. 99. She also testified that Davis approached her and woke her up around "seven times" to solicit her. *Id*. at 115. Second, TS testified that Davis requested that she engage in sexual conduct with him on at least one of these occasions. *Id*. at 113. She said that he "asked [her] if he could lick [her] privates." *Id*. For the third element, Detective Bryant testified that Davis's driver's license showed that Davis was thirty-six years old at the time of the incident. During the course of his investigation, Detective Bryant verified Davis's age on his driver's license by running his license through a government records database. *Id*. at 158. For the fourth and fifth elements, TS, Sauber, and Detective Bryant testified that TS was fourteen on the date of the incident. *Id*. at 85, 100, 157. This places TS within the protected age range and places Davis outside of the statutory exception for those who are less than four years older than the solicited minor within the protected age range.

**{¶16}** In viewing all of the evidence in a light most favorable to the prosecution, we see evidence for each of the essential elements of importuning in violation of R.C. 2907.07(B)(1). Without considering the weight or credibility of the evidence presented at trial, we find that the State produced adequate evidence

that, if believed by the jury, could support a finding of guilty. Thus, Davis's conviction is supported by sufficient evidence.

## Manifest Weight of the Evidence Review

{¶17} Under the manifest weight standard, "the appellate court sits as a 'thirteenth juror' * * *," *Thompkins, supra*, at 387, and

> **must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'**

*State v. Plott,* 2017-Ohio-38, --- N.E.3d ---, at ¶ 73 (3d Dist.), quoting *Thompkins, supra,* at 387. "When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment 'in exceptional case[s]' when the evidence 'weighs heavily against the conviction.'" *State v. Gervin*, 3d Dist. Marion No. 9-15-52, 2016-Ohio-8399, ¶ 138, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

## Legal Analysis

{¶18} Davis's contention that his conviction is inconsistent with the manifest weight of the evidence primarily addresses the credibility of TS's testimony. In particular, Davis alleges that TS's account is inconsistent at points with Sauber's testimony and the information she provided to law enforcement as recorded in the initial police report. Since TS's testimony was the only direct evidence of several

essential elements of this offense, Davis argues that his conviction was based on evidence that was not credible and that the verdict returned against him was, therefore, against the manifest weight of the evidence.

{¶19} Davis points to three exchanges between TS and defense counsel during cross examination to support his argument. *Id*. at 128, 129, 131. The first exchange defense counsel identifies addresses how long Davis was gone during one of his absences while TS was babysitting. *Id*. at 128. TS stated that Davis was gone "[a]bout an hour," but defense counsel implied that the police report gave a different length of time. *Id*. However, TS explained that she did not have a cell phone on which she could check the time and "really wasn't sure how long he was gone." *Id*. at 114, 128, 130. During the second exchange, TS stated that she left the house at 8:20 a.m. *Id*. at 128. The defense counsel, however, referenced the police report, which stated that she left around 7:35 a.m. *Id*. at 129. TS explained twice that the seven in the police report "should have been an eight." *Id*. In the third alleged inconsistency, defense counsel points to an apparent conflict between TS's testimony and Sauber's testimony. During direct examination, TS stated that her brother was not present at the jobsite, but her father had stated earlier at trial that her brother was present at the jobsite. *Id*. at 90, 131. TS, however, resolved this apparent contradiction when she explained that her brother did not come in the morning to the jobsite and came later in the day. *Id*. at 131-132. Thus, it appears

that she and her father were speaking about whom was present at the jobsite during different periods of time.

{¶20} As we evaluate these exchanges, we note that "the mere existence of inconsistencies in the testimony of different witnesses does not mandate that an appellate court reverse a conviction on manifest weight grounds." *State v. Wareham*, 3d Dist. Crawford No. 3-12-11, 2013-Ohio-3191, ¶ 24. The jurors, as the triers of fact, are entitled to rely on what they find to be credible in a witness's testimony as they reach a verdict. In this case, the three exchanges that defense counsel identified for review discuss peripheral details and do not implicate the material facts of this case. Further, TS had a plausible explanation for each of these alleged inconsistencies during cross examination that the jurors could have reasonably believed. *Id*. at 128, 129, 131-132. These alleged inconsistencies do not undermine TS's credibility to such an extent that a rational juror could not have found that her testimony was trustworthy as to the elements of the crime. We also do not see any other indication in the record that the jury lost its way and returned a verdict against the manifest weight of the evidence. Thus, Davis's first assignment of error is overruled.

*Third Assignment of Error*

{¶21} Under this assignment of error, Davis, who is an African-American, argues that the trial court failed to provide a representative sampling of African-Americans in the jury pool and, in so doing, violated his Sixth Amendment right to

be tried by a jury of his peers. Specifically, Davis argues that Seneca County's practice of drawing a jury pool from voter registration lists effectively prohibited him from having a jury of his peers in this case.[1] On appeal, he cites societal change as the basis for urging this court to reconsider its previous decisions on this issue, which have held that a jury selection process that randomly picks the jury pool from voter registration lists is permissible. *See State v. Cosey*, 3d Dist. Marion No. 9-86-29, 1988 WL 32982, 8-9 (March 28, 1988); *State v. Garcia*, 3d Dist. Putnam No. 12-11-07, 2012-Ohio-1795, ¶ 33-34. We are not persuaded by this argument.

Standard of Review

{¶22} "[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). "[D]efendants are not entitled to a jury of any particular composition, * * * but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *State v. Jones*, 91 Ohio St.3d 335, 339-340, 744 N.E.2d 1163 (2001), quoting *Taylor* at 528. The United States Supreme Court has set forth the *Duren* test to evaluate claims of fair-cross-section violations.

---

[1] Appellant limits the scope of his argument to the effects of this jury selection method in his specific case. His argument does not address whether this court should consider any systematic issues with this process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). This

test reads as follows:

> **To establish a prima facie violation of the fair-cross-section requirement * * * a defendant must prove that: (1) a group qualifying as "distinctive" (2) is not fairly and reasonably represented in jury venires, and (3) "systematic exclusion" in the jury-selection process accounts for the underrepresentation.**

*Berghuis v. Smith*, 559 U.S. 314, 327, 130 S.Ct. 1382, 176 L.Ed.2d 249 (2010),

citing *Duren* at 364.

> **"[O]nce the defendant has made a prima facie showing of an infringement of his constitutional right to a jury drawn from a fair cross section of the community, it is the State that bears the burden of justifying this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest."**

*State v. Stockton*, 3d Dist. Shelby No. 17-96-15, 1997 WL 232245, 3 (May 5, 1997),

quoting *Duren, supra*, at 368.

**{¶23}** Additionally, if defense counsel failed to object to an alleged

impropriety below, all but plain error is waived on appeal. Crim.R. 52(B). Under

the plain error standard, "the defendant bears the burden of demonstrating that a

plain error affected his substantial rights." *State v. Ireland*, --- N.E.3d ---, 2017-

Ohio-263, ¶ 17 (10th Dist.). "Even if the defendant satisfies this burden, an

appellate court has discretion to disregard the error and should correct it only to

'prevent a manifest miscarriage of justice.'" *State v. Perry*, 101 Ohio St.3d 118,

2004-Ohio-297, 802 N.E.2d 643, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21,

27, 759 N.E.2d 1240 (2002), quoting *State v. Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804 (1978), paragraph three of the syllabus. "We may reverse only when the record is clear that defendant would not have been convicted in the absence of the improper conduct." *State v. Smith*, 3d Dist. Hardin No. 6-14-14, 2015-Ohio-2977, ¶ 62.

Legal Analysis

**{¶24}** We begin our analysis by noting that Davis's trial counsel did not object to the selection method of the jury pool below. Thus, we will only review for plain error as we apply the *Duren* test. Davis's case satisfies the first prong of this test as "African-Americans are a distinctive group" under the fair-cross-section analysis. *Jones, supra,* at 340, citing *U.S. v. Rioux*, 97 F.3d 648, 654 (2d Cir.1996). However, Davis fails to provide any data that would demonstrate that jury venires do not represent the population as a whole. He also does not present any information that suggests the alleged underrepresentation of African-Americans in the jury pool is the result of systematic exclusion in the jury selection process. Absent evidence showing underrepresentation of African-Americans in jury venires and systematic exclusion of African-Americans in the process of jury selection, Davis cannot satisfy the second and third prongs of the *Duren* test. He cannot, therefore, carry the burden of showing that his Sixth Amendment rights were substantially prejudiced under a plain error standard.

{¶25} Further, we decline to reconsider our prior precedent regarding the jury selection process employed by Seneca County in this case because "[t]he Ohio Supreme Court has consistently upheld the calling of venires from voter registration lists as in conformity with the Sixth Amendment right to a jury drawn from a fair-cross-section of the community." *State v. Satta*, 3d Dist. Marion No. 9-01-38, 2002-Ohio-5049, ¶ 54, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002–Ohio–2126, 767 N.E.2d 216, ¶ 106; *State v. Moore*, 81 Ohio St.3d 22, 28, 689 N.E.2d 1 (1998); *State v. Johnson*, 31 Ohio St.2d 106, 285 N.E.2d 751 (1972), paragraph two of the syllabus. For these reasons, Davis's third assignment of error is overruled.

*Fourth Assignment of Error*

{¶26} As the basis of this argument, Davis asserts that the prosecution engaged in prosecutorial misconduct by making the following comment during closing statements:

> **Now, what has the [d]efense been in this case? Well, during opening statements, we heard from Mr. Smith [defense counsel]— and again, I'm not a good notetaker. She is, but I'm not. But my recollection was that he said the evidence was going to show that his client wasn't even there. What evidence have you heard or seen that he wasn't there? I would suggest that you've heard nothing supporting that defense that he wasn't there.**

Trial Tr. 183. Davis contends that this comment prejudiced his Fifth Amendment right not to testify by leading jurors to "make inferences about Davis's lack of testimony" and, in so doing, violating his right to a fair trial. Appellant's Brief, 17. We find this argument to be unpersuasive.

-19-

Standard of Review

**{¶27}** "A prosecutor is entitled * * * to 'wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom.'" *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 274. *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970). In these cases, the standard of review "is [1] whether remarks are improper and, if so, [2] whether they prejudicially affected substantial rights of the accused." *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990), citing *State v. Smith*, 14 Ohio St.3d 13, 14-15, 470 N.E.2d 883 (1984). *State v. Sommerfield*, 3d Dist. Union No. 14-07-09, 2007-Ohio-6427, ¶ 6. "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Cornwell*, 86 Ohio St.3d 560, 571, 715 N.E.2d 1144, 1154 (1999), quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87 (1982).

**{¶28}** "We evaluate the allegedly improper statements in the context of the entire trial." *State v. Klein*, 3d Dist. Union No. 14-12-09, 2013-Ohio-2387, ¶ 60, citing, *State v. Treesh*, 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001), citing *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993). In this determination,

> **an appellate court should consider [four factors:] (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant.**

*State v. Johnson*, 3d Dist. Allen No. 1-13-45, 2014-Ohio-4750, ¶ 87, quoting *State v. Braxton*, 102 Ohio App.3d 28, 41, 656 N.E.2d 970 (8th Dist. 1995).

{¶29} "For a conviction to be reversed on the basis of prosecutorial misconduct, a defendant must prove the prosecutor's acts were improper and that they prejudicially affected the defendant's substantial rights." *State v. Merriweather*, 12th Dist. Butler No. CA2016-04-077, 2017-Ohio-421, ¶ 45, citing *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 62. "To establish prejudice, a defendant must show that a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different." *State v. Liles*, 3d Dist. Allen No. 1-14-61, 2015-Ohio-3093, ¶ 31, quoting *State v. Porter*, 4th Dist. Meigs No. 10CA15, 2012–Ohio–1526, ¶ 20. "If, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty, even without the improper remarks, then the trial will not be deemed unfair." *State v. Tenace*, 109 Ohio St.3d 255, 2006–Ohio–2417, 847 N.E.2d 386, ¶ 45.

{¶30} Further, if the defense counsel did not object at trial to the allegedly prejudicial remarks, then all but plain error is waived. *State v. Potts*, 69 N.E.3d 1227, 2016-Ohio-5555, ¶ 85, citing *Smith*, 2015-Ohio-2977, at ¶ 63. Crim.R. 52(B). "A court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice." *State v. Stevens*, 58 N.E.3d 584, 2016-Ohio-446, ¶ 55, quoting *Smith,* 2015-Ohio-2977, at ¶ 63. Under

the plain error standard, "[w]e may reverse only when the record is clear that defendant would not have been convicted in the absence of the improper conduct." *Smith,* 2015-Ohio-2977*,* at ¶ 63, citing *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646, (1997).

Legal Analysis

**{¶31}** We begin by applying the four factors to be considered by appellate courts in evaluating allegedly improper comments. First, these remarks were stated during the State's closing arguments, which are not evidence. Trial Tr. 174. The State's allegedly improper comments were made in reference to the defense counsel's opening statement in which defense counsel claimed that the trial would show that Davis was not present at the time of the alleged incident. *Id*. at 79-80. Davis's testimony was mentioned as part of what would establish that he was not present at the time of the alleged offense. *Id*. at 79. In the end, however, Davis did not testify in his own defense.

**{¶32}** Second, we note that defense counsel did not object at trial to these statements by the prosecution. *Id*. at 183. Thus, all but plain error is waived. *State v. Manley*, 3d Dist. Allen No. 1-11-04, 2011-Ohio-5082, ¶ 13. Third, no curative instructions were issued to address the specific comment at issue on appeal, but no objection was raised by defense counsel to prompt such an instruction. Trial Tr. 183. The jurors were, however, instructed not to consider closing arguments as evidence. *Id*. at 174. Fourth, TS's testimony provided evidence for all of the

essential elements of the offense except the age of the defendant. *Id*. at 98, 113-115. Portions of TS's testimony were corroborated by the testimony of Sauber and Slater. The testimony from Detective Jonathan Bryant regarding government records of TS's age and the defendant's age established these essential elements of the crime. *Id*. at 157-158. See R.C. 2907.07(B)(1). Further, the additional finding—that Davis had been previously convicted of a sexually oriented offense—was supported by the admission of Davis's prior record. Ex. 1.

**{¶33}** After examining these statements under these four factors, we find that these comments were not improper. In opening statements, the Defense announced that the primary thrust of their argument at trial would be that Davis was not at home during the times he was alleged to have committed the crime of importuning. Here, the prosecution was merely addressing the Defense's main argument. This comment does not explicitly address Davis's Fifth Amendment rights or his decision not to testify. We do not believe that the wording of these statements would have caused the average juror to focus their attention on Davis's decision not to testify at trial or prompted them to make negative inferences against Davis for exercising his Fifth Amendment rights. Rather, these comments were general statements that pointed to the weaknesses in the Defense's arguments. Since these comments were not improper, they did not prejudice Davis's substantial rights and do not amount to plain error. For these reasons, Davis's fourth assignment of error is overruled.

*Second Assignment of Error*

**{¶34}** Here, Davis alleges that his defense counsel committed four errors during the course of his trial that denied him his right to the effective assistance of counsel. First, in his opening statement, defense counsel told the jurors that Davis was going to testify but did not call a single witness for the Defense's case-in-chief. Trial Tr. 79, 170. Second, defense counsel gave a short closing argument in which he did not explain why Davis did not testify. *Id*. at 187-190. Third, defense counsel did not challenge the jury pool under Crim.R. 24 on the grounds that no African-Americans were included. Fourth, defense counsel did not object during the State's closing arguments when the prosecutor allegedly committed prosecutorial misconduct. Davis argues that his defense counsel's failures deprived him of a fair trial. We disagree.

Standard of Review

**{¶35}** In *Strickland v. Washington*, the Supreme Court of the United States established a two-prong test for determining whether a criminal defendant was denied the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). Under the first prong of the *Strickland* test,

> **the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.**

*State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.3d 905 (1999), quoting *Strickland* at 687. "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95. "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56, citing *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992). "A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy." *Conley* at ¶ 56, citing *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985).

{¶36} To satisfy the second prong of the *Strickland* test,

**the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.**

*Calhoun* at 289, quoting *Strickland* at 687. "To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Bibbs*, 3d Dist. Hancock No. 5-16-11, 2016-Ohio-8396, ¶ 13, quoting *Conway* at ¶ 95. Appellate courts examine the record to determine "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." *State v. Rodriquez*, 3d Dist. Defiance

No. 4-16-16, 2017-Ohio-1318, ¶ 9, quoting *State v. Hester*, 45 Ohio St.2d 71, 74 O.O.2d 156, 341 N.E.2d 304 (1976), paragraph four of the syllabus.

**{¶37}** In Ohio, a licensed attorney is presumed to be competent. *State v. Walker*, 2016-Ohio-3499, 66 N.E.3d 349, ¶ 20 (3d Dist.), citing *Calhoun* at 289. For this reason, the petitioner has the burden of proving that counsel was ineffective at trial. *Id*. "The failure to prove either 1) a substantial violation or 2) prejudice caused by the violation makes it unnecessary for a court to consider the other prong of the test." *Walker* at ¶ 20, citing *State v. Anaya*, 191 Ohio App.3d 602, 2010-Ohio-6045, 947 N.E.2d 212, ¶ 25.

Legal Analysis

**{¶38}** *Defense Counsel's Opening Statement*:  Davis claims that defense counsel's statements in opening arguments constitute ineffective assistance of counsel because defense counsel told the jurors that the defendant would testify but never called Davis as a witness.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *State v. Cepec*, 2016-Ohio-8076, --- N.E.3d ---, ¶ 123, quoting *Strickland, supra*, at 690-691.  "[C]ounsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *Cepec* at ¶ 123, quoting *Treesh, supra*, at 490.  Further, "a midtrial change in strategy [does not] necessarily constitute deficient performance."  *Id*. at ¶ 111, quoting *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 134.

Defense counsel's statements during opening arguments revealed his overall strategy for this case. For some reason—not apparent from the record—this initial strategy was revised. Regardless of whether Davis chose not to testify or was advised not to testify, defense counsel had to exercise his judgment to adjust the trial strategy as the circumstances required. *See State v. Carter*, 5th Dist. Stark No. 2002CA00125, 2003-Ohio-1313, ¶ 31-32. These types of tactical adjustments are not grounds for an ineffective assistance of counsel claim. We do not see from the record how this adjustment falls below the standard of reasonable representation, and Davis has not demonstrated how omitting these few phrases from the Defense's opening arguments would have changed the outcome of the trial.

{¶39} *Defense Counsel's Closing Argument*: Davis argues that the brevity of defense counsel's closing argument and the absence of an explanation providing the reasons that Davis did not testify constitutes ineffective assistance of counsel. However, "the manner and content of trial counsel's closing arguments are a matter of strategy * * *." *State v. Turks*, 3d Dist. Allen No. 1-08-44, 2009-Ohio-1837, ¶ 40-41. *See State v. Burke*, 73 Ohio St.3d 399, 406, 653 N.E.2d 242 (1995). Defense counsel's closing arguments focused on the credibility of TS, whose testimony provided the only evidence for several of the essential elements of the crime. Trial Tr. 187. The closing arguments highlighted a consistent theme in the defense's strategy and did not fall below the standard of reasonableness required of attorneys. Further, Davis has not demonstrated how this is an "[error] so serious that counsel

was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" or how a longer closing argument that explained why Davis did not testify would have changed the result of the trial. *State v. Carter*, 64 Ohio St.3d 218, 224, 594 N.E.2d 595, 600 (1992). *See State v. Dunlap*, 10th Dist. Franklin No. 03AP-481, 2003-Ohio-6830, ¶ 29-30; *State v. Guysinge*r, 4th Dist. Ross No. 15CA3514, 2017-Ohio-1167, ¶ 33-34.

{¶40} *Failure to Challenge the Jury Pool*: Davis argues that defense counsel's failure to object to the racial composition of the jury pool constituted ineffective assistance of counsel. We addressed the substance of this argument in our analysis of the third assignment of error. The Ohio Supreme Court and this Court have consistently held that the jury selection process employed by Seneca County is compatible with the constitutional requirements of the Sixth Amendment. *Yarbrough*, *supra*, at ¶ 106; *Moore*, *supra*, at 28; *Johnson*, 31 Ohio St.2d 106, 285 N.E.2d 751 at paragraph two of the syllabus; *Satta*, *supra*, at ¶ 54; *Cosey*, *supra*, at 8-9; *Garcia*, *supra*, at ¶ 33-34. In not objecting to the racial composition of the jury pool, defense counsel's representation was not deficient because he made a tactical decision that was logically consistent with the legal precedent in this district. Further, Davis cannot demonstrate that an objection to the jury pool at trial would have likely resulted in a different outcome because the trial court had no obligation to choose a different jury pool. *State v. Howard*, 4th Dist. Scioto No. 11CA3415,

2012-Ohio-4690.  *See State v. Walton*, 4th Dist. Ross No. 03CA2716, 2003-Ohio-6514, ¶ 22-25.

{**¶41**} *Failure to Object to Prosecutor's Closing Argument*:  Davis argues that defense counsel erred by failing to object during the prosecution's closing statement.  This argument was the subject of the fourth assignment of error.  In that analysis, we determined that the State did not engage in prosecutorial misconduct in closing arguments by making improper comments.  We cannot here find that defense counsel was ineffective for failing to object to a closing argument that we have found not to be objectionable.  Additionally, the choice to object or remain silent during closing arguments falls squarely "within counsel's realm of tactical decision-making."  *State v. Brown*, 12th Dist. Warren No. CA2002-03-026, 2002-Ohio-5455, ¶ 22.  *See State v. Coben*, 2d Dist. Greene No. 2001 CA 8, 2002 WL 313133, 3 (March 1, 2002).

{**¶42**} On appeal, Davis points to four instances in which he alleges his counsel was ineffective, but he does not move beyond these bare allegations by explaining how his counsel's decisions were deficient or how he was prejudiced by defense counsel's actions.  Thus, Davis has not carried the burden of showing that he was denied his right to the effective assistance of counsel at trial.  For these reasons, his second assignment of error is overruled.

*Fifth Assignment of Error*

**{¶43}** In his fifth assignment of error, Davis argues that the cumulative effect of the errors committed at trial by defense counsel not only denied him the effective assistance of counsel but also denied him a fair trial. As the basis of this argument, Davis points to the claims of ineffective assistance of counsel that were raised on appeal. Having considered these alleged errors under the second assignment of error, we find this argument to be unpersuasive.

Standard of Review

**{¶44}** The constitutional "guarantee of a fair trial does not mean an error-free or perfect trial * * *." *City of Columbus v. Forest*, 36 Ohio App.3d 169, 171, 522 N.E.2d 52, 55, (10th Dist.1987), citing *United States v. Hasting*, 461 U.S. 499, 508-509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623, 637 (1995). "To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors." *State v. Stober*, 3d Dist. Putnam No. 12-13-13, 2014-Ohio-5629, ¶ 15, quoting *In re J.M.*, 3d. Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36.

Legal Analysis

**{¶45}** In this case, Davis pointed to four instances in which alleges his counsel was ineffective. In our analysis of his second assignment of error, we determined that counsel's representation in these four situations was not deficient against the standard of reasonableness to which attorneys are held. The record shows that these choices were tactical decisions and were not errors. Since these situations do not present evidence of harmless error when considered individually, they cannot present grounds for reversible error when considered cumulatively. For these reasons, the doctrine of cumulative error is not applicable to this case. *See State v. Markley*, 3d Dist. Marion No. 9-14-39, 2015-Ohio-1890, ¶ 56. Davis's fifth assignment of error is overruled.

*Conclusion*

**{¶46}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Court of Common Pleas of Seneca County is affirmed.

*Judgment Affirmed*

**ZIMMERMAN and SHAW, J.J, concur.**

**/hls**